1   Amanda C. Sommerfeld (State Bar No. 185052)
    asommerfeld@JonesDay.com
2   JONES DAY
    555 South Flower Street
3   Fiftieth Floor
    Los Angeles, CA  90071.2300
4   Telephone:    +1.213.489.3939
    Facsimile:    +1.213.243.2539
5
    Scott Morrison (State Bar No. 320167)
6   scottmorrison@jonesday.com
    JONES DAY
7   4655 Executive Drive, Suite 1500
    San Diego, CA 92121
8   Telephone:    +1.858.314.1200
    Facsimile:    +1.844.345.3178
9
    Patricia T. Stambelos (SBN 166998)
10  patricia@patriciastambelos.com
    STAMBELOS LAW OFFICE
11  543 Country Club Drive, Suite B209
    Simi Valley, CA  93065
12  Telephone:    +1.805.578.3474
    Facsimile:    +1.805.994.0199
13
    Attorneys for Defendants
14  SKYWEST, INC. AND
    SKYWEST AIRLINES, INC.
15

16              UNITED STATES DISTRICT COURT

17            NORTHERN DISTRICT OF CALIFORNIA

18               SAN FRANCISCO DIVISION

19
    CODY MEEK, *et al.*,                     Case No. 3:17-cv-01012-JD
20
            Plaintiff,                       **DEFENDANTS SKYWEST, INC. AND
21                                           SKYWEST AIRLINES, INC.'S
        v.                                   RESPONSE IN OPPOSITION TO
22                                           PLAINTIFFS' MOTION FOR CLASS
    SKYWEST, INC. and SKYWEST                CERTIFICATION (FRCP 23)**
23  AIRLINES, INC.,
                                             Judge:      Hon. James Donato
24          Defendants.                      Hearing:    April 22, 2021
                                             Time:       10:00 a.m.
25                                           Courtroom:  11

26                                           Complaint Filed:  February 27, 2017
27                                           Trial Date:       January 24, 2022

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ................................................ 1

II.   STATEMENT OF FACTS ............................................................................................. 2

    A.    THE PARTIES.................................................................................................... 2

    B.    THE PUTATIVE CLASS IS COVERED BY A COLLECTIVE BARGAINING AGREEMENT AND INCLUDES AT LEAST 18 DIFFERENT JOB ROLES AND 14 DIFFERENT STATIONS......................... 3

    C.    PUTATIVE CLASS MEMBERS' RESPONSIBILITIES REVOLVE AROUND FLIGHT SCHEDULES. ................................................................. 3

    D.    IRREGULAR OPERATIONS AFFECT FLIGHT SCHEDULES AND HAVE DIFFERENT EFFECTS ON DIFFERENT AGENTS. ............................. 4

    E.    PLAINTIFFS' EXPERIENCE IS LIMITED TO—AT BEST—TWO POSITIONS, AND THEY PROVIDE EVIDENCE OF ONLY FOUR STATIONS. .......................................................................................................... 6

    F.    THE RELEVANT SKYWEST POLICIES. .......................................................... 7

    G.    SKYWEST'S TIME RECORDS DO NOT TELL THE WHOLE STORY. ........... 7

III.  LEGAL STANDARD .................................................................................................... 9

IV.  OBJECTIONS TO EVIDENCE .................................................................................... 9

V.   PLAINTIFFS HAVE FAILED TO PROVE THAT THEIR PAY-TO-THE-SCHEDULE, MEAL-PERIOD, AND REST-PERIOD CLAIMS ARE WORTHY OF CLASS TREATMENT. ........................................................................................... 10

    A.    PLAINTIFFS MEAL- AND REST-PERIOD CLAIMS LACK COMMONALITY, AND INDIVIDUALIZED ISSUES PREDOMINATE........ 10

          1.    Plaintiffs Have Failed To Show That SkyWest Has A Common Practice Or Policy Resulting In Meal Period Violations And That Individual Issues Do Not Predominate. .................................... 11

          2.    Plaintiffs Have Failed To Show That SkyWest Has A Common Practice Or Policy Resulting In Rest Period Violations And That Individualized Issues Do Not Predominate............................... 17

          3.    Plaintiffs Do Not Present Evidence Of Geographic Commonality........... 19

    B.    PLAINTIFFS PAY-TO-THE-SCHEDULE CLAIM LACKS COMMONALITY, AND INDIVIDUALIZED ISSUES PREDOMINATE........ 20

    C.    PLAINTIFFS HAVE FAILED TO SATISFY THE TYPICALITY REQUIREMENT FOR CLASS TREATMENT OF ANY OF THEIR CLAIMS.............................................................................................................. 23

    D.    PLAINTIFFS AND THEIR COUNSEL ARE NOT ADEQUATE REPRESENTATIVES BECAUSE THEY HAVE A CONFLICT OF interest WITH MEMBERS OF THE PUTATIVE CLASS. ................................. 24

    E.    PLAINTIFFS' DERIVATIVE CLAIMS SHOULD BE DENIED CERTIFICATION TO THE EXTENT THEY RELY ON PLAINTIFFS' PAY-TO-THE-SCHEDULE, MEAL-, AND REST-PERIOD CLAIMS............. 25

**TABLE OF CONTENTS**
(continued)

**Page**

VI.     CONCLUSION ............................................................................................................. 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page**

3

4

CASES

5

*Am. Express Co. v. Italian Colors Rest.*,
  570 U.S. 228 (2013) ...............................................................................................9

6

7

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997) ...............................................................................................9

8

9

*Antemate v. Estenson Logistics, LLC*,
  No. CV 14-5255 DSF, 2019 WL 4670670 (C.D. Cal. Sept. 25, 2019) .................12

10

11

*Blackwell v. SkyWest Airlines, Inc.*,
  245 F.R.D. 453 (S.D. Cal. 2007).......................................................................12, 13

12

13

*Brinker Rest. Corp. v. Superior Ct.*,
  273 P.3d 513 (Cal. 2012) ......................................................................................11

14

15

*Brown v. Fed. Express Corp.*,
  249 F.R.D. 580 (C.D. Cal. Feb. 26, 2008) ............................................................17

16

17

*Campbell v. PricewaterhouseCoopers, LLP*,
  253 F.R.D. 586 (E.D. Cal. 2008) ..........................................................................24

18

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013).................................................................................................9

19

20

*Cummings v. Starbucks Corp.*,
  No. CV 12-06345-MWF, 2014 WL 1379119 (C.D. Cal. Mar. 24, 2014) ...............12

21

22

*David v. Queen of Valley Med. Ctr.*,
  264 Cal. Rptr. 3d 279 (Ct. App. 2020).................................................................11

23

24

*Delbridge v. Kmart Corp.*,
  No. C 11-02575 WHA, 2013 WL 2605513 (N.D. Cal. Jun. 11, 2013)...................20

25

26

*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147 (1982)...............................................................................................24

27

*Gonzalez v. Officemax N. Am.*,
  Nos. SACV 07-00452 ............................................................................................17

28

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998)..................................................................................25

*Howard v. CVS Caremark Corp.*,
  No. CV 13-04748 SJO, 2014 WL 11497793 (C.D. Cal. Dec. 19, 2014).................................25

*Hughes v. WinCo Foods*,
  No. ED CV11-00644 JAK, 2012 WL 34483 (C.D. Cal. Jan 4, 2012)....................................25

*Kelley v. SBC, Inc.*,
  No. 97-cv-2729 CW, 1998 WL 928302 (N.D. Cal. Nov. 13, 1998)........................................24

*Lampe v. Queen of the Valley Med. Ctr.*,
  228 Cal. Rptr. 3d 279 (Ct. App. 2018)........................................................................11

*Martinez v. Joe's Crab Shack Holdings*,
  179 Cal. Rptr. 3d 867 (Ct. App. 2014)........................................................................23

*Nielson v. Sports Auth.*,
  No. C 11-4724...........................................................................................................24

*Ordonez v. Radio Shack, Inc.*,
  No. CV 10-7060-CAS, 2013 WL 210223 (C.D. Cal. Jan. 17, 2013)..........................12, 17, 18

*Pedroza v. PetSmart Inc.*,
  No. ED CV 11-298-GHK, 2013 WL 1490667 (C.D. Cal. Jan. 28, 2013) ...............................20

*Roberts v. Marshalls of CA, LLC*,
  No. 13-cv-04731-MEJ, 2017 WL 3314994 (N.D. Cal. Aug. 3, 2017) ...................................24

*Rojas-Cifuentes v. ACX Pac. Nw. Inc.*,
  No. 2:14-cv-00697-JAM-CKD, 2018 WL 2264264 (E.D. Cal. May 17, 2018) .....................12

*See's Candy Shops, Inc. v. Superior Ct.*,
  148 Cal. Rptr. 3d 690 (Ct. App. 2012)....................................................................20, 21

*Silva v. AvalonBay Cmtys., Inc.*,
  No. LA CV15-04157................................................................................................25

*Tien v. Tenet Healthcare Corp.*,
  147 Cal. Rptr. 3d 620 (Ct. App. 2012).......................................................................18

*Van Asdale v. Int'l Game Tech.*,
  577 F.3d 989 (9th Cir. 2009).......................................................................................22

*Vinole v. Countrywide Home Loans, Inc.*,
   571 F.3d 935 (9th Cir. 2009) ...................................................................................11

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ..............................................................................10, 11, 20, 22

*Zinser v. Accufix Rsch. Inst., Inc.*,
   253 F.3d 1180 (9th Cir. 2001) .................................................................................11

**STATUTES**

CAL. CODE REGS. Title 8, § 11090(7)(3) ......................................................................17

CAL. CODE REGS. Title 8, § 11090(11)(D) .....................................................................16

CAL. CODE REGS. Title 8, § 11090(12) ...........................................................................8

CAL. CODE REGS. Title 8, § 11090(12)(A) .....................................................................17

CAL. LAB. CODE § 226.7(b) ...................................................................................16, 19

1

I.      **INTRODUCTION AND SUMMARY OF ARGUMENT**

2

Plaintiffs are three former employees of SkyWest Airlines, Inc. (SkyWest), who worked

3

primarily at the San Francisco International Airport (SFO) as ramp agents.  They seek

4

certification of a class of California Frontline Employees in connection with their Pay-to-

5

Schedule (Count 1), Meal- and Rest-Period (Count 2), and Overtime (Count 3) claims. They also

6

seek certification of a subclass of current and former SFO Frontline Employees in connection

7

with their Local Ordinance (Count 7) claim.  And if any of the above classes are certified for any

8

of the above claims, they would like to extend that certification to their derivative Waiting Time

9

Penalty (Count 6) and Unfair Competition (Count 5) claims. Plaintiffs do not seek to certify their

10

Wage Statement (Count 4) claim.

11

SkyWest does not oppose Plaintiffs' bid for certification of Counts 3 and 7, or, to the

12

extent that they are derivative of those two claims, Counts 5 and 6. SkyWest will separately move

13

for summary adjudication on those claims and theories. Nor does SkyWest contest numerosity.

14

But Plaintiffs have failed to prove the elements of commonality, typicality, adequacy, and

15

predominance to justify certification of Counts 1 and 2.

16

**Commonality** – Plaintiffs intend to rely on time records and limited anecdotal testimony

17

to prove their claims on a classwide basis. But the time records do not constitute common proof

18

of liability, and Plaintiffs' proffered testimony is in conflict with each other and with SkyWest's.

19

So, Plaintiffs have failed to satisfy the commonality element.

20

Plaintiffs have also failed to offer any evidence whatsoever of practices at *ten* of the

21

fourteen airports at issue—with the overwhelming weight of their evidence aimed at ramp

22

operations at SFO.

23

**Typicality** – Plaintiffs seek to represent a putative class of current and former SkyWest

24

employees covering 15 or more unique jobs across 14 airports in California. But they worked

25

in—at most—*two* of the many positions included within the putative class. They offer no

26

evidence that their claims are typical of those in other roles.

27

**Adequacy** – Plaintiffs and their counsel seek to represent some employees with whom

28

they have an inherent conflict of interest. Plaintiffs submit evidence that supervisors prevented

1   Agents from taking California compliant meal and rest periods and required them to work without

2   pay. Meanwhile, SkyWest's evidence from supervisors—who are also putative class members—

3   shows that some Agents chose not to take the compliant breaks that they were provided, and that

4   supervisors did not require agents to work without pay.  Plaintiffs and their counsel cannot

5   represent two groups of people when they plan to blame one group for the harms done to the

6   other, and when the testimonies of one group will be used to impeach the other.

7       **Predominance** – As the conflicting testimony shows, determining liability for Plaintiffs'

8   meal, rest, and pay-to-schedule claims will require extensive, highly individualized inquiry.

9   Because these inquiries will predominate over common ones, class certification is inappropriate.

10  **II.**    **STATEMENT OF FACTS**

11      **A.    THE PARTIES**

12      SkyWest is the largest independently owned regional airline in the country. *Cooper Decl*.

13  ¶ 2.[1] In addition to operating flights on behalf of American, Alaska, Delta, and United, SkyWest

14  provides ground-handling and customer services at airports nationwide. *Id.* ¶¶ 2–3. During the

15  putative class period, SkyWest provided ground handling and customer services at fourteen

16  stations throughout California: (1) San Francisco (SFO), (2) Los Angeles (LAX), (3) Ontario

17  (ONT), (4) San Luis Obispo (SBP), (5) Long Beach (LGB), (6) Arcata (ACV), (7) Redding

18  (RDD), (8) Santa Maria (SMX), (9) Chico (CIC), (10) Crescent City (CEC), (11) Carlsbad

19  (CLD), (12) Inyokern (IYK), (13) Stockton (SCK), and (14) Modesto (MOD). *Id.* ¶ 3. Today,

20  SkyWest provides ground handling and customer services only at ACV, RDD, and SBP. *Id.* ¶ 4.

21      Plaintiffs are all former SkyWest "ramp agents," ECF Nos. 137 ¶ 3, 138 ¶ 3, 139 ¶ 3,

22  although Meek also filled in occasionally as a "shift supervisor" at SFO. ECF No. 137 ¶ 3;

23  *Campbell Decl.* ¶ 15. Plaintiffs hope to represent a class of "Frontline Employees" who have

24  worked in California at any time since February 27, 2013. ECF No. 112 ¶ 95.

25

26

27  _____
    [1] Citations to SkyWest's supporting declarations will include the declarant's name, while citations

28  to Plaintiffs' declarations will be to the ECF No. Citations to ECF Nos. will include pin cites based on the CM/ECF pagination at the top of the page.

**B.    THE PUTATIVE CLASS IS COVERED BY A COLLECTIVE BARGAINING AGREEMENT AND INCLUDES AT LEAST 18 DIFFERENT JOB ROLES AND 14 DIFFERENT STATIONS.**

"Frontline Employees" are those who fall within SkyWest's "Airport Operations"—formerly known as "Customer Service"—umbrella. *Cooper Decl.* ¶ 5. And, as this Court previously found, those "Frontline Employees" are covered by a collective bargaining agreement (CBA). ECF No. 90 at 5.

SkyWest maintains 12 classifications of "Frontline" Agents including: (1) Operations; (2) Customer Service; (3) Cross Utilized (CUA); (4), Cross Utilized Supervisor; (5) Ramp; (6) Ramp Supervisor; (7) Customer Service Supervisor; (8) Air Cargo; (9) SST; (10) Station Clerk; (11) Hub Certified Station Trainer; and (12) Temporary Ramp. *Cooper Decl.* ¶ 7.  Some of these categories are further subdivided into specific roles. *Id.* For example, CUAs and Customer Service Agents may have the specific "role" of Ticketing, or Gate, and some Ramp Agents may actually be assigned regularly to Commissary, "Tow Team," Baggage, or Loaders. *Id.* Each role comes with a different set of job duties and responsibilities, different supervisor(s), different available shifts (also known as "bids"), and a different workplace within the airport. *Id.*

Not all airports have all roles.  Some roles, like the Tow Team, were only at hubs. *Cooper Decl.* ¶ 8. CUAs were usually found at small, regional airports with smaller staffs like Redding, Arcata, Stockton, and Modesto. *Cooper Decl.* ¶ 8.

**C.    PUTATIVE CLASS MEMBERS' RESPONSIBILITIES REVOLVE AROUND FLIGHT SCHEDULES.**

Anyone who has been to an airport is generally familiar with the putative class members because they help ensure that passengers—and their luggage—get to and from their destinations safely. Ticketing Agents help passengers check in for their flight, check their luggage, and print out their boarding passes. *Id.* ¶ 10. A Customer Service Agent may then direct the passengers to the gate and escort special needs and disabled passengers. *Id.* ¶ 12.

Baggage Agents take lost luggage claims from passengers and investigate lost or damaged luggage, *id.* ¶ 13, and Loaders sort and load luggage onto the correct aircraft, and ensure the luggage makes it to the correct carousel at the destination. *Id.* ¶ 14. Gate Agents help passengers

SkyWest's Opposition to Plaintiffs'
Motion for Class Certification
Case No. 3:17-cv-01012-JD

to board the planes, assist special-needs and disabled passengers, assist with loading wheelchairs and strollers, and otherwise address passenger needs. *Id.* ¶ 11. They inform passengers of gate changes and delays. *Id.* If a flight is canceled or delayed, they find alternatives, rebook passengers, and address any concerns with overnight lodging and transportation. *Id.*

Ramp Agents marshal the aircraft in and out of the gate; in the hubs, the Tow Team is sometimes needed to tow aircraft in and out of the gate. *Id.* ¶ 14. Ramp Agents also count, weigh, and place luggage appropriately to ensure proper weight and balance of the aircraft and assist with servicing the aircraft in between flights. *Id.* At non-hubs, Ramp Agents de-ice the aircraft.

Operations Agents work behind the scenes to plan gate assignments for inbound and outbound flights, pre-plan the weight and balance of flights, communicate fuel requests, as well as other service items, like potable water and lavatory needs. They also keep management informed about irregular operations ("IROPs"). *Id.* ¶ 15. During IROPs, Operations Agents coordinate all departments to ensure a smooth operation that professionally and effectively addresses passenger needs. *Id.*

All of these agents' responsibilities depend on two things: passengers and flights. *Id.* ¶ 16. When there is a plane on the ground, ticketing and gate agents are working to check-in and board passengers, while ramp agents are working to load and service the aircraft to prepare it for takeoff. *Id.* ¶¶ 10, 14. If a plane has landed but Agents aren't working, then flights will be delayed, which would cause passengers to miss connecting flights and could mean they cannot timely reach their ultimate destination. Once a flight departs, however, the work stops until the next group of passengers arrives to check in and the next plane is on the ground. *See, e.g.*, *Denny Decl.* ¶ 13; *Vasquez Decl.* ¶ 17. Airline operations can be described as a boom-bust job—periods of time with lots to do to keep flights on time followed by periods of downtime with nothing to do but wait for the next flight. *Campbell Decl.* ¶ 14.

### D.  IRREGULAR OPERATIONS AFFECT FLIGHT SCHEDULES AND HAVE DIFFERENT EFFECTS ON DIFFERENT AGENTS.

Flight schedules are planned weeks—even months—in advance so that passengers can plan their trips accordingly. A passenger knows well in advance that her trip from San Francisco

to Orlando will have a connecting flight in Dallas, and the national aviation network remarkably choreographs the entire thing. The airlines carefully plan to ensure that the aircraft from Las Vegas makes it to San Francisco on time to pick up our passenger at 7:00 a.m. and drop her off in Dallas at 12:08 p.m., where another aircraft from Denver waits to take her—and her checked luggage—at 12:53 p.m. to her destination in Orlando at 3:40 p.m. for a week at Disney World.

In a perfect world, our passenger lands on time in Orlando, checks in at her hotel by 5:00, and enjoys her evening at Epcot, eating sushi in "Japan" and sipping Sangria in "Spain." But any traveler knows that "something" can happen at any step of the travel day that has the potential to throw the whole thing off. Those unanticipated events are IROPs.

There are any number of "things" that qualify as IROPs. Extreme weather at an originating or destination airport can cause delays to incoming and outgoing flights. *Cooper Decl.* ¶ 17; *Campbell Decl.* ¶ 13. Mechanical malfunctions, mandatory periods of rest for flight crew,[2] traffic jams on the tarmac—even visits from the President on Airforce One—are all IROPs that can keep a plane (or all planes) grounded. *Cooper Decl.* ¶ 17; *Campbell Decl.* ¶ 13. Animals on the runway and blocked gates may keep aircraft from landing or docking at the jet bridge. *Cooper Decl.* ¶ 17. Jet bridge malfunctions may require maintenance, preventing passengers from de-boarding and onboarding and requiring a gate swap. *Id.* And in-flight emergencies or dangerous circumstances at a destination airport may require a diversion, sending passengers and crew to an airport that wasn't expecting them (and that they did not plan to visit). *Id.*

Although the occurrence of IROPs is fairly common, the timing and type of IROPs is unpredictable. *Id.* ¶ 18. Station Managers take historical trends into consideration when making staffing and scheduling decisions, *Morrison Decl.*, Ex. F ("*Denny Dep.*"), 22:3–11, but it's not possible to plan for every situation. Every day—every shift—is different and brings with it a unique set of circumstances and challenges, and the different types of IROPs have different impacts on different types of agents, even on the same shift. A canceled flight will likely have little immediate impact on ramp agents who are assigned to marshal in or service aircraft but will

---

[2] Under federal law, pilots and flight attendants can only work for a specified period of time before "timing out" and being forced to take a minimum of 8 hours off. If a member of the flight crew "times out," then the aircraft sits until a replacement crewmember can be found.

1  require loaders to ensure that luggage makes it to the passengers or is transferred to another

2  aircraft. *Cooper Decl.* ¶ 18. And gate agents will have to re-book passengers on new flights and

3  address passenger concerns, like missed connections and overnight lodging. *Id*. As the gate agents

4  and loaders work more to accommodate the IROP, the ramp agents enjoy some downtime.

5        On the other hand, an aircraft that arrived late may have flown in along with a bank of

6  flights, requiring extra work from ramp agents, but not as much from customer service agents. *Id*.

7  During that IROP, the customer service agents get to eat and rest while the ramp agents work to

8  get the late flight back on track, all while keeping the remaining flights on schedule. SFO—where

9  all three plaintiffs and the vast majority of their declarants worked—is notorious for having heavy

10  fog that delays flights for *hours*. *Campbell Decl.* ¶ 13. When there is fog, and no flights can land

11  or take-off, agents get to rest, eat, play games, watch movies, run errands, read, socialize, and

12  generally do whatever they want, completely duty free. *Denny Decl.* ¶ 11; *Campbell Decl*. ¶ 14;

13  *Warren Decl.* ¶ 14;[3] *Naumann Decl.* ¶ 22. But when the fog lifts, it's all hands on deck to get

14  flights off the ground and our hypothetical passenger back on her way to Disney World.

15          **E.**     **PLAINTIFFS' EXPERIENCE IS LIMITED TO—AT BEST—TWO**

16                 **POSITIONS, AND THEY PROVIDE EVIDENCE OF ONLY FOUR**
                 **STATIONS.**

17        All three plaintiffs were "Ramp Agents," and none of them worked in one of the more

18  specialized sub-categories. *See* ECF Nos. 137 ¶ 3, 138 ¶ 3, 139 ¶ 3.  Meek did, however, fill in as

19  a Shift Supervisor from time to time. ECF No. 137 ¶ 3. So, between the three of them, a mere *two*

20  positions were worked.

21        Plaintiffs and their 39 declarants worked at only four of the fourteen California stations

22  during the putative class period. Those stations are SFO, LAX, ONT, and SBP. *See generally*

23  ECF Nos. 137–140. And for those four stations, Plaintiffs submit evidence from 33 agents who

24  worked at SFO, 5 who worked at ONT, 4 who worked at LAX, and only 2 from SBP.[4] *See*

25  *generally* ECF Nos. 137–140. Plaintiffs do not submit any evidence of practices at LGB, ACV,

26  [3] "During the downtime, there was nothing for the Agents to do but 'hang out.' I refer to it as
'deadly boring delays.' . . . Then Agents typically socialize with each other or with other airport

27  workers, play games, hang out on their personal devices, study or do whatever else they want to
do." *Warren Decl.* ¶ 14.

28  [4] Some declarants, like Plaintiff Ross, worked at multiple stations.

SkyWest's Opposition to Plaintiffs'
Motion for Class Certification
Case No. 3:17-cv-01012-JD

1    RDD, SMX, CIC, CEC, CLD, IYK, SCK, or MOD. *See generally* ECF Nos. 137–140.

2    **F.    THE RELEVANT SKYWEST POLICIES.**

3        Plaintiffs point to two written policies to support their bid for class certification:

4    SkyWest's meal period and "Pay to Schedule" ("PtS") policies. SkyWest's meal-period policy

5    guarantees an "uninterrupted, continuous meal period of no less than 30 minutes" to employees

6    scheduled to work five or more hours in one shift. ECF No. 134 at 18. Under the PtS policy,

7    SkyWest pays employees according to their scheduled start and end times, but allows employees

8    to clock in up to five minutes before or after the start of their shift and clock out up to five

9    minutes before or after the end of their shift. ECF No. 134 at 20; *Hoover Decl.* ¶ 6. The PtS

10   policy assumes that no work is performed during those 5-minute windows before the start of a

11   shift or after the end of a shift. *Id.* If work is in fact begun before the start of the shift, a

12   mechanism exists to ensure it is paid. *Id.*; *Morrison Decl.*, Ex. B ("*Hoover Dep.*") 91:9–92:3.

13       SkyWest's PtS policy is part of a larger framework of timekeeping and payroll policies.

14   SkyWest's timekeeping system overrides the PtS policy when an employee clocks in or out

15   beyond that five-minute window. *Hoover Decl.* ¶ 7. Early clock-ins are flagged for a manager's

16   attention, who then ensures that the employee is paid from the punch. *Id.* And late clock-outs are

17   paid without further attention. *Id.* SkyWest is clear that all work should be paid. *Id.* ¶ 8. Time

18   worked is all the time actually spent on the job performing assigned duties. *Id.* Employees must

19   report any discrepancies in their time or pay records to management for correction. *Id.*

20   **G.    SKYWEST'S TIME RECORDS DO NOT TELL THE WHOLE STORY.**

21       Because SkyWest's policies are compliant, Plaintiffs have the burden of demonstrating

22   that their claims are amenable to class treatment by other means of common proof. The time

23   records, however, cannot provide those means.

24       As witnesses on both sides of this case have testified, the time records *do not tell the full*

25   *story*. For example, as employees who service aircraft and passengers, Frontline agents' work is

26   largely dependent on flight schedules. *Cooper Decl.* ¶ 16. When there is a plane on the ground,

27   the agents are working; and when a plane is wheels up, the agents are not and have downtime to

28   eat, rest, or otherwise do whatever they want—on the clock. *Denny Decl.* ¶ 11; *Campbell Decl.* ¶

- 7 -

14; *Warren Decl.* ¶¶ 14, 16; *Naumann Decl.* ¶ 22; *Naea Decl.* ¶ 11. Some agents spend this time watching movies and playing games, *Denny Decl.* ¶¶ 12–13; *Campbell Decl.* ¶ 14, others sleep, *Naumann Decl.* ¶ 18, and others run personal errands in—or out of—the terminal.[5] Some of these personal activities occur during off-the-clock meal breaks, but much take place during on-the-clock "rest." The time records won't show all of this on-the-clock rest and recreation.

IROPs also contribute to agent downtime.  A delayed inbound flight, an aircraft that requires maintenance, a heavy fog layer or other weather event that prevents planes from taking off or landing—all of these can result in downtime for the agents. *Campbell Decl.* ¶ 14; *Rifilato Decl.* ¶ 11; *Vasquez Decl.* ¶ 12. On those days that these things occurred, when it came time for an agent to take their *off the clock* meal or rest break, sometimes they waived or declined to take one because they had so much downtime that they were already fed and rested. *Vasquez Decl.* ¶ 23 (agents "sometimes chose to skip their off-the-clock meal period on days when they had already had lots of downtime earlier in their shift to eat and relax and later did not want to punch out and lose pay when they did not feel they needed another break").  The time records won't show the agent's decision not to take the provided break. And California law does not obligate SkyWest (or any employer) to track 10-minute rest periods, CAL. CODE REGS. tit. 8, § 11090(12), so there is no record at all of taken, skipped, short, or late rest periods. *Hoover Decl.* ¶ 10.

Finally, Plaintiffs all testified that the time records are not necessarily indicative of time worked because they could clock in a little earlier than their scheduled time, but have some free time before their shift in which they weren't working. *See Morrison Decl.*, Ex. C ("Meek Dep."), 118:24–25; Ex. D ("Ross Dep."), 89:11–16; Ex. E, 71:21–72:7 ("Barnes Dep."). And while SkyWest disputes the allegation and would seek to disprove it, even one of Plaintiffs' declarants admits that the time records are unreliable when he testified that he was sometimes instructed to

---

[5] Paul Naumann, a putative class member, declared that he "would always see Agents from the ramps who [he] knew were on a 'break' but not clocked out." *Naumann Decl.* ¶ 18. He also declared that, "[w]hen you kind of know the ebb and flow of the flights and the work demands, you can anticipate when you can get away." *Id.* Josh Campbell, another putative class member, declared that SFO sometimes had periods of downtime where "no flight can arrive or depart for 3 hours," and during that time, agents were "free to go to other terminals, to restaurants, to visit with friends at other airlines, or to hang out in the breakroom, on the ramp, or wherever they wanted." *Campbell Decl.* ¶ 14.

1    start work early but *not* clock in until the scheduled start of his shift. *See* ECF No. 140-12 ¶ 7. As

2    a matter of fact, the evidence shows that so much happens outside of the time records, that the

3    records are *unreliable* for determining liability on a classwide basis.

4    **III.    LEGAL STANDARD**

5          The class action is "an *exception* to the usual rule that litigation is conducted by and on

6    behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)

7    (emphasis added) (internal quotations and citation omitted).  "To come within the exception, a

8    party seeking to maintain a class action must affirmatively demonstrate his compliance with Rule

9    23." *Id*. But Rule 23 "imposes stringent requirements for certification that in practice *exclude*

10   *most* claims." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013).  Plaintiffs bear

11   the burden of demonstrating with evidence that they have met each of Rule 23(a)'s four threshold

12   requirements: (1) that the class is "numerous," (2) there are questions of law or fact that are

13   "common to the class," (3) the class representatives' claims are "typical" of the class, and (4) the

14   class representatives and their counsel will "fairly and adequately" protect the class's interest.

15   FED. R. CIV. P. 23(a); *Comcast*, 569 U.S. at 33.

16         Further, to certify a class under Rule 23(b)(3),[6] the court must find that "the questions of

17   law or fact common to class members predominate over any questions affecting only individual

18   members, and that a class action is superior to other available methods for fairly and efficiently

19   adjudicating the controversy." FED. R. CIV. P. 23(b)(3).  The test for predominance is "far more

20   demanding" than that for commonality and the court has a "duty to take a 'close look'" at whether

21   that "vital prescription" is satisfied. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623–24

22   (1997); *Comcast*, 569 U.S. at 34. Here, as explained below, it is not.

23   **IV.    OBJECTIONS TO EVIDENCE**

24         Much of Plaintiffs' opening brief and supporting declarations include comments that are

25   wholly irrelevant to the pending motion. Of Plaintiffs' 42 declarants (including Plaintiffs

26   themselves), 37 mention that they worked outside in various weather conditions, 30 lived far

27   away and commuted to the airport, and 31 could not afford to live closer to the airport. *See*

28   ───────────────
     [6] Plaintiffs have not moved for certification under Rule 23(b)(1) or (2). *See* ECF No. 134.

SkyWest's Opposition to Plaintiffs'
Motion for Class Certification
Case No. 3:17-cv-01012-JD

1   *Morrison Decl.*, Ex. A. SkyWest objects that *all* of these statements are irrelevant to the pending

2   motion because they do not tend to prove or disprove that numerosity, commonality, typicality,

3   adequacy, and predominance are satisfied to warrant class treatment of Plaintiffs' claims.

4        In addition, *all but one* of Plaintiffs' 39 declarants make the same statement, which is

5   objectionable for multiple reasons: "Sometimes, during shifts in which I did not get full breaks in

6   an organized manner, I would become [tired/exhausted/hungry/etc.], which negatively impacted

7   my ability to perform my job to the standards set by SkyWest." *Id.* First, the statement is vague

8   and ambiguous because it's not at all clear what "organized manner" means; nor does the law

9   guarantee "organized" meal and rest breaks. Second, whether agents were tired, exhausted,

10  hungry, etc., is not relevant because it does not tend to prove or disprove any of the elements at

11  issue in Plaintiffs' motion—numerosity, commonality, typicality, adequacy, and predominance.

12  Neither does their performance—with which SkyWest has not taken issue.

13  **V.**   **PLAINTIFFS HAVE FAILED TO PROVE THAT THEIR PAY-TO-THE-**

14  **SCHEDULE, MEAL-PERIOD, AND REST-PERIOD CLAIMS ARE WORTHY OF CLASS TREATMENT.**

15       SkyWest does not contest that the proposed classes are sufficiently numerous. But

16  Plaintiffs have failed to show that their pay-to-schedule (Count 1) and meal- and rest-period

17  (Count 2) claims may be resolved through common proof, that individual issues do not

18  predominate, that their claims are typical of the entire, broadly defined class of "Frontline

19  Employees," and that they and their counsel are adequate representatives for all class members.

20  Consequently, Counts 1 and 2 should not be certified—nor should the derivative claims (Counts 5

21  and 6), to the extent they rely on Counts 1 and 2.[7]

22      **A.**   **PLAINTIFFS MEAL- AND REST-PERIOD CLAIMS LACK COMMONALITY, AND INDIVIDUALIZED ISSUES PREDOMINATE.**

23

24       The commonality requirement "is easy to misread, since '[a]ny competently crafted class

25  complaint literally raises common questions.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349

26  (2011) (internal quotation marks and citation omitted).  "What matters to class certification . . . is

27  _____

28  [7] Plaintiffs have not moved to certify their wage-statement claim (Count 4). Nevertheless, for the
    reasons stated in Section V, class treatment is inappropriate because individual issues will
    predominate with respect to the predicate claims.

SkyWest's Opposition to Plaintiffs'
Motion for Class Certification
Case No. 3:17-cv-01012-JD

1    not the raising of common 'questions'—even in droves—but rather, the capacity of a classwide

2    proceeding to generate common answers apt to drive the resolution of the litigation.

3    Dissimilarities within the proposed class are what have the potential to impede the generation of

4    common answers." *Id.* at 350.

5        Moreover, under Rule 23(b)(3), where "the complexities of class action treatment

6    outweigh the benefits of considering common issues in one trial," a class action is not the superior

7    method for resolving claims. *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir.

8    2001). "If each class member has to litigate numerous and substantial separate issues to establish

9    his or her right to recover individually, a class action is not 'superior'" even if common issues

10   exist. *Id.*; *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 947 (9th Cir. 2009) (denying

11   certification where the court would "need to hold several hundred mini-trials with respect to

12   each" putative class member's individual circumstances).

13   **1.    Plaintiffs Have Failed To Show That SkyWest Has A Common**
     **Practice Or Policy Resulting In Meal Period Violations And That**
14   **Individual Issues Do Not Predominate.**

15       "State law obligates employers to afford their nonexempt employees meal periods . . .

16   during the workday." *Brinker Rest. Corp. v. Superior Ct.*, 273 P.3d 513, 521 (Cal. 2012). An

17   employer satisfies this obligation "if it relieves its employees of all duty, relinquishes control over

18   their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute

19   break, and does not impede or discourage them from doing so." *Id.* at 536–37. "[T]he employer is

20   not obligated to police meal breaks and ensure no work thereafter is performed." *Id.* at 537. "A

21   missed meal break does not constitute a violation if the employee waived the meal break, or

22   otherwise voluntarily shortened or postponed it." *Lampe v. Queen of the Valley Med. Ctr.*, 228

23   Cal. Rptr. 3d 279, 293 (Ct. App. 2018). "Similar principles apply to rest periods." *David v. Queen*

24   *of Valley Med. Ctr.*, 264 Cal. Rptr. 3d 279, 285 (Ct. App. 2020) (citing *Brinker*, 273 P.3d at 528).

25       Plaintiffs have not—and cannot—prove that liability for their meal-period claim can be

26   determined through common proof.  As Plaintiffs readily admit, SkyWest's written policy

27   complies with California's meal period requirements. *See* ECF No. 134 at 18.  So, Plaintiffs must

28   point to some other form of common proof that will determine liability on a classwide basis. *See*

1    *Ordonez v. Radio Shack, Inc.*, No. CV 10-7060-CAS (JCGx), 2013 WL 210223, at *8 (C.D. Cal.

2    Jan. 17, 2013). They fail to do so.

3           Plaintiffs attempt to support their request for certification of their meal-period class with

4    time-punch records and limited anecdotal evidence. *See* ECF No. 134 at 17:27–18:10.  But courts

5    *routinely* find that time records do not constitute common proof of meal period violations. *See,*

6    *e.g.*, *Antemate v. Estenson Logistics, LLC*, No. CV 14-5255 DSF (RAOx), 2019 WL 4670670, at

7    *5 (C.D. Cal. Sept. 25, 2019) ("That Class Members sometimes delayed, shortened, or missed

8    meal breaks does not prove break claims on either an individual or classwide basis because *mere*

9    *records of late, short, or missed breaks say nothing about* why *the breaks were late, short, or*

10   *missed*") (emphasis added); *Rojas-Cifuentes v. ACX Pac. Nw. Inc.*, No. 2:14-cv-00697-JAM-

11   CKD, 2018 WL 2264264, at *7 (E.D. Cal. May 17, 2018) (declining to certify a meal period class

12   and finding that time records indicating late, short, or missed meal periods in **61.1%** of eligible

13   shifts "do[] not reflect a common policy and practice capable of common resolution on a class-

14   wide basis" because there are "numerous possibilities as to *why* certain employees may have had

15   a [non-compliant] meal break during a given shift"); *Ordonez*, 2013 WL 210223, at *7 (finding

16   no commonality and denying certification because "there is *no way* of determining on a classwide

17   basis whether" time records showing missed, late, or short meal periods "were violations, a legal

18   conclusion, or whether individual class members voluntarily opted to start their meal break late,

19   cut it short, or not take a break at all" (emphasis added)); *Cummings v. Starbucks Corp.*, No. CV

20   12-06345-MWF (FFMx), 2014 WL 1379119, at *12 (C.D. Cal. Mar. 24, 2014) (finding no

21   commonality and denying certification because, even with "time records showing examples of

22   other employees who worked more than five hours without receiving either a meal period or a

23   penalty payment," "there is *no common answer* as to *why* employees took a late meal break, and

24   individualized inquiries into each late meal break would be required" (emphasis added));

25   *Blackwell v. SkyWest Airlines, Inc.*, 245 F.R.D. 453, 467–68 (S.D. Cal. 2007) (declining to certify

26   a meal period class because individual issues would predominate where time records did not

27   prove liability and the court would have to individually inquire into matters of waiver,

28   disobedience, and on-the-clock meal periods).

1    To give one example, Plaintiffs' declarant, Erick Castro, claims that as much as *half* of his

2  meal periods were cut short due to "unexpected inbound" flights and his manager's instruction to

3  clock back in and work them. ECF No. 140-4 ¶ 10. But according to the time records, out of

4  Castro's more than 70 shifts,[8] only 6 of them involved a meal period that was shorter than 30

5  minutes. *Hoover Decl.*, Ex. A.[9] Of those 6 "short" meal periods, 2 of them were 29 minutes

6  long,[10] 2 of them were 28 minutes long,[11] and 1 of them was 26 minutes long.[12] *Id.* The

7  remaining meal period includes the comment: "swiped in early from lunch due to a quick-turn &

8  ramp supervisor Nate's order."[13] *Id.* This is the only shift that indicates that Castro was asked to

9  clock in early from a meal break—let alone due to an "unexpected inbound." For the other five

10  shifts, Plaintiffs would have to prove that SkyWest failed to *provide* a 30-minute meal period,

11  instead of Castro *choosing* to clock in 1, 2, or 4 minutes early. Perhaps the length of his meal

12  breaks appears to be shorter than 30 minutes because he went to buy his lunch after leaving his

13  post on the ramp but before he went to the break room to clock out.  Indeed, another putative

14  class member and ramp supervisor testified that "[i]t was a common practice at SFO for Agents to

15  go and pick up food for their meals before coming to the breakroom to clock out for meal

16  breaks." *Campbell Decl.* ¶ 19. Ultimately, the time records will not definitively prove either

17  party's position.

18    In *Blackwell v. SkyWest Airlines, Inc.*, 245 F.R.D. 453 (S.D. Cal. 2007), SkyWest

19  successfully opposed the plaintiff's bid for certification of a meal-period claim for the same group

20  of employees at issue here, and there is no reason why this Court should reach a different result.

21  Here, SkyWest's declarants—some of whom are putative class members—have declared under

22  penalty of perjury that the time records do not convey the whole story. For example, sometimes

23  there was so much downtime in between flights that agents were able to relax in the breakroom,

[8] Some days, he shift traded into double shifts.

[9] Those shifts occurred on July 6, July 7, July 24, July 31, August 21, and August 29, 2015.

[10] July 31, 2015, and August 29, 2015

[11] July 6, 2015, and July 24, 2015

[12] July 7, 2015

[13] August 21, 2015

get food, watch TV, or play games for at least 30, uninterrupted minutes—all on the clock. *Denny Decl.* ¶ 13; *Campbell Decl.* ¶ 14; *Warren Decl.* ¶¶ 14, 16; *Naumann Decl.* ¶¶ 18, 22; *Naea Decl.* ¶ 20; *Rifilato Decl.* ¶ 11. SkyWest's former Station Manager of SFO (and former employee), Harmar Denny, testified to several instances where his employees were enjoying extensive, duty-free, on-the-clock breaks. *See Denny Decl.* ¶¶ 11–13, 15. As just one example, Denny remembers his ramp agents having a long period of downtime due to a delayed incoming flight—an IROP. *Id.* ¶ 13. Because there was nothing to do, he allowed them to spend that time as they wanted. *Id.* But when the flight finally arrived and no agents were there to handle it, Denny went into the breakroom to find the crew engrossed in a movie—some of them eating—unaware of the time. *Id.* And yet the time records *won't show* this on-the-clock break, even though they may show that some of the crew did not *clock out* for a meal within the first five hours of their shift.

At one period of time, the SFO agents' competitive and reoccurring Dominoes tournaments during downtime led to such competitive behavior and conflict that Denny had to ban the game entirely. *Id.* ¶ 12; *Campbell Decl.* ¶ 18. Denny testified that he didn't mind that the agents were playing games on the clock during their downtime—only that those games negatively affected the crew's camaraderie. *Denny Decl.* ¶ 12. When agents have the ability to take extended breaks (on the clock) in the first half of their shifts due to IROPS, many prefer *not* to clock out for a 30 minute meal break in the second half of their shift, because they would rather get paid for that time. *Vasquez Decl.* ¶ 23; *Naumann Decl.* ¶ 22; *Campbell Decl.* ¶¶ 20–21; *Naea Decl.* ¶ 23. And generally speaking, management honored the agents' preference in light of the extensive downtime caused by the IROPs.  *See Vasquez Decl.* ¶ 23; *Naumann Decl.* ¶ 22; *Naea Decl.* ¶ 23.

Denny's experiences were not unique to SFO. At other stations, agents would disappear from their station during downtime to go to the beach. *See Naumann Decl.* ¶ 23; *Pursley Decl.* ¶ 27. Agents at Redding, San Luis Obispo, Modesto, and Stockton are (and/or were) allowed to socialize in the breakroom, play on their phones, or otherwise relax during periods of downtime. *Warren Decl.* ¶ 14; *Vasquez Decl.* ¶ 9. A former supervisor—who is a putative class member—will testify that he would try to send agents on break, but the agents would either *choose* not to take it, or, if working a shift that allowed them to do so, *waive* the meal break. *See Campbell*

1   *Decl.* ¶¶ 20–21. Some of those waivers may have been written or electronic, but many—indeed,

2   most—were oral. *See id.* ¶ 21; *Vasquez Decl.* ¶ 7. Many agents took liberties with their

3   independence and stood in line for food *before* clocking out for their meal breaks, *see Naumann*

4   *Decl.* ¶ 17, and some agents ran out to their car for a personal errand while on the clock. *See Naea*

5   *Decl.* ¶ 8. Agents at LAX, SFO, and ONT would disappear for long periods of time because the

6   stations were so large that supervisors couldn't easily track everyone—some agents were found

7   napping or at other terminals during downtime. *See Naumann Decl.* ¶ 18; *Naea Decl.* ¶ 24.

8   SkyWest's management was extremely permissive of agents' on-the-clock liberties, so long as

9   they showed up when needed to service the flights. *See, e.g., Campbell Decl.* ¶ 11 ("Other Agents

10  may not have a flight at their gate for 45 or 60 minutes and I would see them sitting in the

11  breakroom on the clock or even going to get coffee or food and bringing it back to the breakroom

12  to socialize with co-workers depending on the operation that day.  This was permitted even

13  though they were on the clock."); *Vasquez Decl.* ¶ 31 ("During downtime, Agents were permitted

14  to and frequently left their work area to go to the restaurant on the second floor of the airport

15  terminal to get food and bring it back to eat.  This time was on the clock. If the employee was

16  entitled to take a meal period . . . they were permitted to and did go to the restaurant and get their

17  food before punching out for the meal period.  This could take anywhere from 10-20 minutes.").

18      All of SkyWest's declarants show that time records do not tell the full story or establish

19  liability. Many agents received 30-minute, uninterrupted, paid meal breaks that aren't reflected.

20  *Bowman Decl.* ¶ 7 ("During these breaks between flights, I would also take my 30-minute meal

21  period, although I was not required to punch out."). The time records also don't show when

22  agents would stop to buy food, run personal errands, and otherwise frolic and detour prior to

23  clocking out for a meal, *see Vasquez Decl.* ¶ 31; *Campbell Decl.* ¶ 19 ("It was a common practice

24  at SFO for Agents to go and pick up food for their meals before coming to the breakroom to clock

25  out for meal breaks."), nor do they always explain *why* an agent clocked back in a few minutes

26  early. And while some agents and/or supervisors may have included comments in their time

27  punch records indicating an oral waiver of a meal period (or voluntary election not to take one),

28  many times, such waivers were on-the-fly and not memorialized in writing. *See Vasquez Decl.* ¶

7; *Rifilato Decl.* ¶ 8; *Warren Decl.* ¶ 11.

In addition, SkyWest's declarants contradict Plaintiffs' anecdotal evidence that they were not provided meal breaks. Former station managers and some putative class members declared that meal periods *were* provided as a matter of practice for eligible shifts. *See Vasquez Decl.* ¶ 7; *Naumann Decl.* ¶ 14; *Rifilato Decl.* ¶ 8; *Warren Decl.* ¶ 11; *Denny Decl.* ¶ 8; *Naea Decl.* ¶ 9. During orientation, new-hires were (and are) taught how many meal and rest breaks they were entitled to and the process for taking them. *McNevin Decl.* ¶ 3. They further testify that reasons for recorded late, missed, or short meal periods are *numerous*, and include the employee's *choice* to waive, skip, delay, or clock back in early from a meal break; individual managers' requests to assist with IROPs; and agents enjoying break-appropriate activities (like buying food) prior to clocking out. And while IROPs are just one reason why a meal or rest break may be missed, delayed, or shortened, they are also the cause of *significant* periods of downtime, allowing agents to enjoy the lengthy, on-the-clock, duty-free, *compliant* breaks described above.

The parties' contradictory evidence shows that, not only does SkyWest *not* have a common policy or practice of denying meal breaks,[14] but proving the alleged meal-break violations will require extensive individualized inquiry into the *cause* of each and every short, missed or late meal break, which may involve human error, IROPs, waiver, and frolic and detour.

Plaintiffs argue that the validity of SkyWest's affirmative defense that California's meal- and rest-break laws are preempted as applied under the Airline Deregulation Act (ADA) constitutes a common issue that predominates over individualized inquiries. *See* ECF No. 134 at 32–33. Not so. While a finding in SkyWest's favor on that defense would result in classwide resolution of Plaintiffs' meal- and rest-period claims, a finding that the ADA *does not* preempt those laws *does not* mean that SkyWest is automatically liable for violating them. It merely

---

[14] To the extent Plaintiffs argue that SkyWest's practice of not paying meal- or rest-period premiums constitutes a common practice, such a practice *does not* entitle them to proceed on a class basis. The entitlement to a meal or rest premium necessarily depends on a finding of liability *first*. *SEE* CAL. CODE REGS. tit. 8, § 11090(11)(D) ("If an employer fails to provide an employee a meal period in accordance with the applicable provisions of this order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the meal period is not provided."), & (12)(B) (same for rest periods); *see also* CAL. LAB. CODE § 226.7(b) (same for both meal and rest periods). And as argued, determining liability cannot be done with common proof and will require extensive unique and individualized inquiry.

1   means that the laws govern. Plaintiffs will still have to prove—on a classwide basis—that

2   SkyWest failed to provide meal and rest periods, and SkyWest will be entitled to present evidence

3   to the contrary. Plaintiffs have not—and as shown, cannot—present any common evidence from

4   which liability can be determined. Instead, liability can be determined only by wading through

5   murky waters of individualized inquiry.

6           This Court should therefore find that Plaintiffs have failed to satisfy the commonality and

7   predominance elements of their meal-period class claim.

8                    **2.      Plaintiffs Have Failed To Show That SkyWest Has A Common
                              Practice Or Policy Resulting In Rest Period Violations And That
9                             Individualized Issues Do Not Predominate.**

10          Under California law, employers "shall authorize and permit all employees to take rest

11  periods . . . at the rate of ten (10) minutes net rest time per four (4) hours or major fraction

12  thereof.  However, a rest period need not be authorized for employees whose total daily work

13  time is less than three and one-half (3 1/2) hours." CAL. CODE REGS. tit. 8, § 11090(12)(A).

14  "Because [employers are] required only to make . . . rest breaks *available* to [employees],

15  Plaintiffs may prevail *only* if they demonstrate that [the employer's] policies deprived them of

16  those breaks." *Brown v. Fed. Express Corp.*, 249 F.R.D. 580, 586 (C.D. Cal. Feb. 26, 2008)

17  (emphasis added). "As such, where the evidence does not show, on a *classwide basis*, whether

18  members of the proposed class missed rest breaks as a result of a supervisor's coercion or the

19  employees' uncoerced choice to waive such breaks and continue working, individual issues

20  regarding the reasons for the missed breaks predominate and class certification is *inappropriate*."

21  *Gonzalez v. Officemax N. Am.*, Nos. SACV 07-00452 JVS (MLGx), CV 07-04839 JVS (MLGx),

22  2012 WL 5473764, at *3 (C.D. Cal. Nov. 5, 2012) (emphasis added).

23          Plaintiffs' bid for certification of their rest-period claim is supported with even less

24  evidence than their meal-period claim. Plaintiffs have not pointed to a single method of common

25  proof that they can use to prove SkyWest's liability for alleged rest period violations.[15] California

26  law *does not* require employers to track and record rest periods. *SEE* CAL. CODE REGS. tit. 8, §

27

28  ───────────────────
    [15] Even in cases where the rest period policy is non-compliant, courts decline to certify such
    claims because individual issues still predominate. *See, e.g.*, *Ordonez*, 2013 WL 210223, at *11.

11090(7)(3) ("authorized rest periods *need not be recorded*") (emphasis added). Thus, setting aside the fact that time records don't tell the whole story, Plaintiffs can't rely on *any* records to support their claim. Indeed, Plaintiffs' own expert could do nothing more to estimate rest-period violations than calculate damages based on *arbitrary*, *assumed* violation rates of 100%, 75%, 50%, and 25%. *See* ECF No. 134 at 20. So, Plaintiffs rely *entirely* on declarations from putative class members—a dubious endeavor. *See* ECF No. 134 at 24:28–25:6.

Not only do Plaintiffs' proffered declarations fail to provide any level of specificity that would support a finding of liability, Courts regularly find that class treatment is inappropriate for rest-period claims supported by such limited evidence. *See Ordonez*, 2013 WL 210223, at *12 (denying certification of rest period class and finding that individualized issues will likely predominate where employer did not record rest breaks and plaintiff was "unable to offer any classwide method for proving when class members were or were not authorized and permitted to take a rest break"); *Tien v. Tenet Healthcare Corp.*, 147 Cal. Rptr. 3d 620, 629 (Ct. App. 2012) (affirming decision to deny certification of rest period class where 10-minute breaks were not recorded and proving liability would require "predominately individualized questions of fact").

In addition, both Plaintiffs' and SkyWest's proffered declarations highlight the individualized inquiry necessary to determine liability for rest-break violations. For example, many of Plaintiffs' declarants testified that their rest breaks were *fifteen* minutes long. *See* ECF Nos. 140-3 ¶ 8; 140-4 ¶ 9; 140-10 ¶ 10; 140-19 ¶ 11; 140-23 ¶ 9; 140-27 ¶ 11; 140-28 ¶ 8; 140-33 ¶ 10; 140-35 ¶ 11; 140-38 ¶ 8. While the remainder testified that their breaks were *ten* minutes long. *See generally* ECF No. 140. Because those agents whose 15-minute breaks were cut short may have still received a duty-free, uninterrupted, 10-minute, *compliant* break, one individualized inquiry that bares on liability is the length of the rest break. But declarants from both sides of the 10-15-minute fence *worked at the same station*. C*ompare* ECF No. 140-4 (15-minute breaks at San Francisco) *with* ECF No. 140-5 (10-minute breaks at San Francisco). So, not even the station can serve as a common means of answering this simple question. Rather, the parties will have to pry into other issues like: (1) who was the direct supervisor authorizing the breaks; (2) who was the station manager at the time; (3) was the length of the rest break consistent stationwide at any

given point in time, and if so, at what points in time were 15-minute breaks offered, and at what points in time were 10-minute breaks offered. The list goes on.

The Parties' declarations highlight the variation in *how* rest breaks were provided. For some, rest breaks were provided whenever they were asked for—even during IROPs. *See* ECF No. 140-8 ¶ 7; *Campbell Decl.* ¶ 12. Others had the autonomy to take breaks as needed and as time permitted. *See* ECF No. 140-9 ¶ 8; 140-22 ¶ 7 ("When we didn't have a flight, **we take the initiative to take lunch or break**."); *Campbell Decl.* ¶ 12. Some were taught to relieve one another for breaks whenever possible. *McNevin Decl.* ¶ 3. Others were instructed to take rest breaks by their supervisors. *See Rifilato Decl.* ¶ 10. Whether employees were empowered to send themselves on rest breaks or instructed to wait for a supervisor to release them is critical to determining liability, but that question cannot be answered by common proof.

The declarations also highlight the variation in whether rest breaks were provided at all. For example, all of Plaintiffs' declarants testify that they "did not always get [their] [10 or 15]-minute rest breaks or they could be shortened or delayed." *See generally* ECF No. 140. Other putative class members testified that rest breaks of 10-15 minutes were almost always available and provided, and that they are surprised to hear that anyone would complain about *not* receiving them. *See Naea Decl.* ¶ 10; *Denny Decl.* ¶ 18;[16] *Campbell Decl.* ¶ 12. And some of Plaintiffs' witnesses recognize that missed meal and rest breaks depended on the season, ECF No. 140-39 ¶ 10, the weather, ECF No. 140-36 ¶ 8, their particular gate assignment, ECF No. 140-9 ¶ 8, or IROPs. ECF No. 140-10 ¶ 11. The net result of the parties' conflicting evidence is a lack of commonality[17] and a morass of individualized inquiry. This Court should therefore deny certification of the rest-period claim.

### 3.   Plaintiffs Do Not Present Evidence Of Geographic Commonality.

Plaintiffs and their putative-class-member declarants—42 people in all—worked at only 4

---

[16] "In an average day – 95% of the time in my estimation – there was more than enough downtime for every Agent to get their meal and rest breaks and still have additional non-working time. There was often sufficient downtime that there was no need for Supervisors to track, monitor, or schedule rest breaks." *Denny Decl.* ¶ 18.

[17] Again, for purposes of class certification, it's of no moment that SkyWest did not pay rest period premiums where Plaintiffs cannot show *through common proof* that SkyWest is *liable* to the class to pay those premiums in the first place. *See* Cal. Lab. Code § 226.7(b).

1    stations during the putative class period. Those stations are SFO, LAX, ONT, and SBP. *See*

2    *generally* ECF No. 140. But SkyWest provided ground handling and customer services at *14*

3    *stations* during the relevant time period. *Cooper Decl.* ¶ 3. Plaintiffs have not submitted any

4    evidence of a facially non-compliant policy that would have applied to all stations, and they have

5    not submitted *any evidence* whatsoever for meal- or rest-break practices at LGB, ACV, RDD,

6    SMX, CIC, CEC, CLD, IYK, SCK, or MOD. *See generally* ECF No. 140-1–39.

7            In situations like this, where plaintiffs failed to present evidence for the majority of

8    locations, courts regularly decline to find commonality across them all. Rather, courts either find

9    no commonality at all, or limit their findings to those locations that have evidentiary support. *See,*

10   *e.g.*, *Delbridge v. Kmart Corp.*, No. C 11-02575 WHA, 2013 WL 2605513, at *1, *7 (N.D. Cal.

11   Jun. 11, 2013) (twice limiting the class to a *single K-Mart store* because plaintiffs presented

12   evidence of only one store); *Pedroza v. PetSmart Inc.*, No. ED CV 11-298-GHK (DTBx), 2013

13   WL 1490667, at *8 (C.D. Cal. Jan. 28, 2013) (finding that 12 declarations submitted by

14   employees who worked at Southern California stores, even if true, "do not give rise to the

15   inference that [a] practice applies *throughout* California); *Dukes*, 564 U.S. at 357–58 (finding no

16   commonality at all where evidence was not representative of geography of class size). Here,

17   Plaintiffs have failed to show *any* commonality whatsoever, and their request for certification

18   should be denied.

19           **B.    PLAINTIFFS' PAY-TO-THE-SCHEDULE CLAIM LACKS**
             **COMMONALITY, AND INDIVIDUALIZED ISSUES PREDOMINATE.**
20
21           At the outset, Plaintiffs' argument that their first cause of action is worthy of class

22   treatment concerns two *distinct* types of timekeeping policies that are worth describing: **rounding**

23   **policies** and **grace-period policies**. *See's Candy Shops, Inc. v. Superior Ct.*, 148 Cal. Rptr. 3d

24   690 (Ct. App. 2012), referenced in Plaintiffs' brief, highlights the difference well.

25           **Rounding policies** are those in which the time-clock punches are rounded to the nearest

26   specified increment (*e.g.*, the nearest-tenth of an hour) and the employees were paid according to

27   that rounded time. *Id.* at 700. But **rounding policies** assume the employee *is working at all times*

28   *while clocked in*. *Id.* While some worked time goes uncompensated on a day-to-day basis, other

days may result in compensation for unworked time. *Id.* at 701. R**ounding policies** are legal if they are neutral both facially and as applied over time. *Id.*

   **Grace period policies**, in contrast, pay the employee according to the *scheduled* start and end times of their shift, rather than the actual time punches, as long as the employee clocked in or out during the grace period. *Id.* at 693. The grace period is a specified window of time before the shift's scheduled start and after the shift's scheduled end times (the grace period in *See's Candy* was 10 minutes before and 10 minutes after each shift). *Id.* But unlike rounding policies, **grace period policies** assume that the employee is *not working* during the grace period—indeed, the policy in *See's Candy* prohibited work during the grace period. *Id.* "If the employee performs work during that time," however, "the manager must make a timekeeping adjustment." *Id.*

   SkyWest's PtS policy is neither a rounding nor a grace-period policy, but a hybrid of the best parts of both, and was bargained for by the Frontline Employees' collective bargaining representative ("SAFA") as a benefit to Frontline Employees. *See Cooper Decl*. ¶ 21.

   Before the PtS policy, agents lined up at the time clock to punch in at the beginning of a shift. At hubs in particular, those in the back of the line would be more likely to be marked "late" because their punch time was after their scheduled start even though they were present. *Id.* So, SAFA bargained for some flexibility that allowed agents to clock in before the start of their shift, which would thin out the line at the time clock. *Id.* Thus, the PtS policy.

   The PtS policy allows agents to clock in up to 5 minutes before or after the start of their shift, and clock out up to 5 minutes before or after the end of their shift.[18] *Hoover Decl.* ¶ 6. As the name implies, the PtS policy pays agents according to their shift, rather than the time punches. *Id.* Like a **grace period policy**, the PtS policy *assumes* that agents are not working before and after their shift. *Id.*; *Fenton Decl.* ¶ 7 ("Most of the Agents in my stations [] clock in, put their belongings in their locker, maybe go to the bathroom and get water before beginning to look at the flights for the day."). If an agent *does* work during that time, they can—and should, pursuant to company policy—report it to a manager for compensation. *Hoover Decl.* ¶¶ 6, 8; *Hoover Dep.*

---

[18] If the agent clocks in or out beyond the grace period, the time entry gets flagged for management review, but the agent will be paid for that time regardless. *Hoover Dep*. 92:4–14.

91:9–92:3; *Campbell Decl.* ¶ 7 ("I also told Agents that if they were working before the start of their shift, they should provide notes in DayForce or talk to me, the manager or another supervisor so their time could be adjusted to ensure that they were paid for all time worked.").

Although Plaintiffs refer to it as a "grace period" policy, they appear to argue that commonality is satisfied because a common question is whether SkyWest's PtS policy constitutes an illegal, non-neutral **rounding policy**. *See* ECF No. 134 at 28. However, the test for commonality is not whether there are common questions, but commons *answers* that can be proved by common *evidence*. *Dukes*, 564 U.S. at 350. Like their meal- and rest-break claims, Plaintiffs intend to rely on time records to "demonstrat[e] whether or not the grace policy is neutral in application." ECF No. 134 at 28. But net neutrality is not the relevant standard here because SkyWest does not have a **rounding policy**. The collectively-bargained-for PtS is premised on the notion that the time punches themselves are not reflective of time worked. Plaintiffs' contentions about a purportedly illegal **rounding policy** are thus beside the point.

Plaintiffs' deposition testimony is illustrative. Plaintiff Meek testified that sometimes he may have been clocked in during the five minutes *before* his shift started, but that he may not have been working. *Meek Dep.* 118:24–25. He confirmed that "some days" he may have started working during that five-minute window, while other days he may not have. *Id.* 119:1–3. And he emphasized that the time records "absolutely" would ***not*** show whether he was working during that time or not. *Id.* 119:4–6.[19] Likewise, Plaintiff Ross testified that "if [he] punched in early, yeah, [he had] a little bit of time" before he needed to start working. *Ross Dep.* 89:11–16. He also testified that some people, sometimes, would clock in and then have time to grab coffee before the start of their shift. *Id.* 86:14–21. But he clarified that "It varies. Every day it's different." *Id.* Plaintiff Barnes testified that agents could clock in during a "gap" before or after their shift started. *Barnes Dep.* 71:21–72:7. And while he couldn't remember how big that "gap" was, he thought it may have been as long as 30 minutes before or 10 minutes after the shift started. *Id.*

---

[19] Meek's declaration in support of his motion directly contradicts his deposition testimony. *See* ECF No. 137 ¶ 6 ("As soon as I 'punched in,' I was expected to be immediately ready to work . . . We could only punch in 5 minutes early but once I swiped in and grabbed my radio, I would immediately go to my assignment."). His declaration should therefore be disregarded on this point. *See Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009).

Former SkyWest supervisor agents—who are themselves putative class members—testify that agents generally did not work during the "grace period" and instead used it for personal activities like grabbing coffee, socializing, and parking their car. *Warren Decl.* ¶ 9 ( "[T]he 5-minute buffer allows them to punch in early, put on their uniform if they arrived in street clothes, put their food away, go to their locker, get a cup of coffee, and engage in congeniality of conversation with their fellow co-workers.  And then the shift starts, they receive a briefing, and everybody gets to work."). And others testify that agents could be asked to report to work immediately after clocking in due to operational needs. *See Campbell Decl.* ¶¶ 9–10.  In both cases, the records would report an "SGB" for "Start Grace Before," but the records do not provide a means of distinguishing a "clock in and do what you want" SGB from a "clock in and get started immediately" SGB. That can only be determined through highly individualized inquiry of every employee, every time "SGB" appears in the records, resulting in thousands of mini trials.

Because resolving Plaintiffs' pay-to-the-schedule claim will require employee-specific evidence and highly individualized inquiries, it is unsuitable for class treatment. Plaintiffs' motion as to their first claim as it relates to a pay-to-the-schedule theory should be denied.

## C.   PLAINTIFFS HAVE FAILED TO SATISFY THE TYPICALITY REQUIREMENT FOR CLASS TREATMENT OF ANY OF THEIR CLAIMS.

Plaintiffs were only ever ramp agents, and the putative class of "Frontline Employees" includes 12 formal job classifications, some of which—like the label "Ramp Agent"—are further subdivided into special roles like "Commissary Agent[]," "Tow Team," "Baggage Agents," and others. *Cooper Decl.* ¶ 7. Altogether, there are approximately 15–20 unique roles with different responsibilities, different schedules, and different burdens; but Plaintiffs, who collectively worked in only two of those roles, would like to represent *all* of them.

This leads Plaintiffs to a problem with typicality. "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Martinez v. Joe's Crab Shack Holdings*, 179 Cal. Rptr. 3d 867, 877 (Ct. App. 2014) (internal quotation omitted). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named

SkyWest's Opposition to Plaintiffs'
Motion for Class Certification
Case No. 3:17-cv-01012-JD

1    plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.*

2    at 877–78 (internal citations and quotations omitted). "The commonality and typicality

3    requirements of Rule 23(a) tend to merge." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157

4    n.13 (1982). And courts have found representative plaintiffs' claims atypical or not common of

5    employees who held positions that the representative plaintiffs did not hold. *See Nielson v. Sports

6    Auth.*, No. C 11-4724 SBA, 2012 WL 5941614, at *3–4 (N.D. Cal. Nov. 27, 2012) (typicality

7    "only as to the positions that the plaintiff actually held"); *Roberts v. Marshalls of CA, LLC*, No.

8    13-cv-04731-MEJ, 2017 WL 3314994, at *9 (N.D. Cal. Aug. 3, 2017) (noting "several concerns

9    regarding typicality, including that it was not clear how Plaintiffs' positions were similar to those

10   of the class and the lack of evidence that class members were uniformly subject to the [conduct]

11   that g[a]ve rise to Plaintiffs' claims"); *Campbell v. PricewaterhouseCoopers, LLP*, 253 F.R.D.

12   586, 596 (E.D. Cal. 2008) (agreeing "that plaintiffs' employment in only a single division of a

13   line of service precludes a finding of typicality" where plaintiffs sought to represent people in

14   several divisions and where differences between the work required of them varied); *Kelley v.

15   SBC, Inc.*, No. 97-cv-2729 CW, 1998 WL 928302, at *17 (N.D. Cal. Nov. 13, 1998) (finding

16   typicality "only as to a class comprised of the positions that [plaintiffs] held").

17       Plaintiffs, as ramp agents,[20] have—at best—shown only that their claims and the bases for

18   them are typical of other ramp agents at SFO, LAX, and ONT. They have not shown that their

19   claims are typical of gate agents, ticket agents, towing agents, commissary agents, supervisors, or

20   any of the myriad positions that come within the expansive "Frontline Employee" umbrella. So,

21   any finding of typicality should consequently be limited to a class of ramp agents.

22       **D.    PLAINTIFFS AND THEIR COUNSEL ARE NOT ADEQUATE
             REPRESENTATIVES BECAUSE THEY HAVE A CONFLICT OF
23           INTEREST WITH MEMBERS OF THE PUTATIVE CLASS.**

24       "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and

25   their counsel have any conflicts of interest with other class members and (2) will the named

26   plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon v.*

27   ――――――――――――――

28   [20] While Meek occasionally filled in as a supervisor, he offers no evidence that his grievances as a
     ramp agent applied equally during his stints as a supervisor. Typicality as to them is thus lacking.

1   *Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998) (internal citation omitted). Here, the answer

2   to the first question is "Yes," and the second is "No."

3          Plaintiffs' class definition includes supervisors, but Plaintiffs and their declarants accuse

4   their supervisors of denying them California compliant meal and rest breaks, *see, e.g.*, ECF Nos.

5   140-5 ¶ 11, 140-12 ¶12, 140-16 ¶ 8, and for asking them to perform work for free. *See* ECF No.

6   140-12 ¶ 7. But Frontline supervisors claim that the Frontline Agents would *decline* their offers to

7   take a break. *See Campbell Decl.* ¶ 20. They also deny requiring Agents to work without pay. *Id.*

8   ¶¶ 5, 9. Proving Plaintiffs' claims will require pitting Agents against supervisors.  Plaintiffs'

9   counsel will have to represent some putative class members' interests at the cost of others.

10          Courts find a lack of adequacy in situations like this. *See Hughes v. WinCo Foods*, No. ED

11   CV11-00644 JAK (OPx), 2012 WL 34483 (C.D. Cal. Jan 4, 2012) (conflict of interest precludes

12   adequacy of representation "because Plaintiffs assign partial responsibility for labor law

13   violations to their supervisors, and simultaneously seek to represent [them]"); *Howard v. CVS*

14   *Caremark Corp.*, No. CV 13-04748 SJO (PJWx), 2014 WL 11497793 (C.D. Cal. Dec. 19, 2014)

15   (same); *Silva v. AvalonBay Cmtys., Inc.*, No. LA CV15-04157 JAK (PLAx), 2016 WL 4251600

16   (C.D. Cal. Apr. 20, 2016) (same).  This Court should do the same and deny Plaintiffs' motion.

17          **E.     PLAINTIFFS' DERIVATIVE CLAIMS SHOULD BE DENIED**
              **CERTIFICATION TO THE EXTENT THEY RELY ON PLAINTIFFS'**
18          **PAY-TO-THE-SCHEDULE, MEAL-, AND REST-PERIOD CLAIMS.**

19          Because Plaintiffs have failed to prove that class certification is appropriate for their pay-

20   to-the-schedule (Count 1) and meal- and rest-period (Count 2) claims, this Court should deny

21   certification of Plaintiffs' derivative claims (Counts 5 and 6) to the extent they rely on 1 and 2.

22   **VI.   CONCLUSION**

23          For the foregoing reasons, the motion should be denied as set forth above.

24

25

26

27

28

SkyWest's Opposition to Plaintiffs'
Motion for Class Certification
Case No. 3:17-cv-01012-JD

1    Dated: March 11, 2021                        Respectfully submitted,

2                                                 Jones Day

3

4                                                 By:  ___/s/___*Amanda C. Sommerfeld*___
                                                        Amanda C. Sommerfeld
5
                                                  Counsel for Defendant
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SkyWest's Opposition to Plaintiffs'
Motion for Class Certification
Case No. 3:17-cv-01012-JD