UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CODY MEEK,

          Plaintiff,

     v.

SKYWEST, INC., et al.,

          Defendants.

Case No.  17-cv-01012-JD

**ORDER RE CLASS CERTIFICATION AND MOTION TO SEAL**

Re: Dkt. Nos. 132, 134

Named plaintiffs Cody Meek, Jeremy Barnes, and Coryell Ross seek class certification for employment claims under California state law against SkyWest, Inc. and SkyWest Airlines, Inc. (SkyWest).  Dkt. No. 134.  The parties' familiarity with the record is assumed, and certification is granted in part.  The administrative motion to file under seal, Dkt. No. 132, is denied.

## DISCUSSION

### I.    CLASS CERTIFICATION

Plaintiffs propose a class of "all individuals currently or formerly employed by the Defendants SkyWest Airlines, Inc. and SkyWest, Inc. ('SkyWest') as Frontline Employees who worked on the ground and were paid on an hourly basis ('Frontline Employees') for at least one shift in the State of California at any time from February 27, 2013 through October 18, 2020." Dkt. No. 134, Notice of Motion at 1.  Plaintiffs request certification of this class for their Counts I (grace period claim), II (meal and rest break claims), III (shift trade overtime claim), V and VI (derivative claims), and VII (San Francisco QSP minimum wage claim).  *Id*. at 1-3.

Summary judgment was granted for defendants on plaintiffs' Counts III and VII, *see* Dkt. No. 163, so those counts are now moot for class certification purposes.  *See Corbin v. Time Warner Entertainment-Advance/Newhouse Partnership*, 821 F.3d 1069, 1085 (9th Cir. 2016). Consequently, the claims for possible certification consist of Counts I (grace period claim), II

United States District Court
Northern District of California

(meal and rest break claims), and V and VI (derivative claims).  For these claims, plaintiffs allege that SkyWest "pa[id] its Frontline Employees according to their scheduled hours even though they were under SkyWest's control and expected to be prepared to work from punch-in to punch-out"; and "fail[ed] to provide uninterrupted and timely meal and rest periods in the manner required by the California Labor Code," and "fail[ed] to pay statutory premium wages when the meal and rest breaks . . . were untimely, missed, or interrupted."  Dkt. No. 134, MPA at 1.

The standards governing class certification are well established.  The overall goal is "to select the metho[d] best suited to adjudication of the controversy fairly and efficiently."  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 460 (2013) (internal quotations omitted) (modification in original).  Plaintiffs must show that their proposed classes satisfy all four requirements of Rule 23(a), and at least one of the subsections of Rule 23(b).  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001), *amended by* 273 F.3d 1266 (9th Cir. 2001).  Plaintiffs have elected to proceed under Rule 23(b)(3) only.  Dkt. No. 134.  Plaintiffs, as the parties seeking certification, bear the burden of showing that the requirements of Rule 23 are met for each of their proposed classes.  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012).

The Court's class certification analysis "must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim," though the merits questions may be considered to the extent, and only to the extent, that they are "relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Amgen*, 568 U.S. at 465-66 (internal quotations and citations omitted).  The class certification procedure is decidedly not an alternative form of summary judgment or an occasion to hold a mini-trial on the merits.  *Alcantar v. Hobart Service*, 800 F.3d 1047, 1053 (9th Cir. 2015).  The decision of whether to certify a class is entrusted to the sound discretion of the district court.  *Zinser*, 253 F.3d at 1186.

## A.     Numerosity (23(a)(1))

Rule 23(a)(1) requires that a proposed class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Plaintiffs state, with evidentiary support, that "over 1700

United States District Court
Northern District of California

1    Frontline Employees worked for SkyWest during the Class Period."  Dkt. No. 134 at 2.  SkyWest

2    does not contest numerosity.  Dkt. No. 141 at 1.  This element is satisfied.

3        **B.      Typicality and Adequacy (23(a)(3)-(4))**

4        Rule 23(a) requires the named plaintiffs to demonstrate that their claims are typical of the

5    putative class, and that they are capable of fairly and adequately protecting the interests of the

6    class.  Fed. R. Civ. P. 23(a)(3)-(4).  The named plaintiffs say typicality is satisfied because "all

7    Plaintiffs held the same position, performed the same duties, and were subjected to the same work

8    rules and pay practices as all other members of the Class."  Dkt. No. 134 at 18.  They add that

9    adequacy is satisfied because "no Plaintiff has any interest that is antagonistic to the interests of

10   the proposed Class," and they have engaged counsel who are experienced class action litigators.

11   *Id*. at 18-19.

12       SkyWest challenges typicality on the ground that plaintiffs "were only ever ramp agents,"

13   while the proposed class "includes 12 formal job classifications, some of which -- like the label

14   'Ramp Agent' -- are further subdivided into special roles like 'Commissary Agent[],' 'Tow

15   Team,' 'Baggage Agents,' and others."  Dkt. No. 141 at 23.  In SkyWest's view, plaintiffs have

16   shown only that "their claims and the bases for them are typical of other ramp agents at SFO,

17   LAX, and ONT."  *Id*. at 24.

18       The point is not well taken.  As will be addressed in greater detail shortly, the parties'

19   submissions demonstrate that the proposed class members are alleged to have had the same or

20   similar injuries which were based on the same course of conduct, across the various job

21   classifications for Frontline Employees and at the various California airport locations.  This

22   satisfies typicality.  *See Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017).

23       SkyWest contests adequacy on the ground that plaintiffs' "class definition includes

24   supervisors."  Dkt. No. 141 at 25.  This is a problem, they say, because "[p]roving Plaintiffs'

25   claims will require pitting Agents against supervisors," and so "Plaintiffs' counsel will have to

26   represent some putative class members' interests at the cost of others."  *Id*.  Not so.  Plaintiffs'

27   claims are directed at SkyWest, not at the individual supervisors.  "The question whether

28   employees at different levels of the internal hierarchy have potentially conflicting interests is

United States District Court
Northern District of California

3

context-specific and depends upon the particular claims alleged in a case." *Staton v. Boeing Co.*, 327 F.3d 938, 958-59 (9th Cir. 2003). SkyWest has not identified a "substantive issue for which there is a conflict of interest between" agents and supervisors. *Id.*

### C.    Commonality (23(a)(2)) and Predominance (23(b)(3))

The commonality requirement under Rule 23(a)(2) is satisfied when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Because "any competently crafted class complaint literally raises common questions," the Court's task is to look for a common contention "capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Alcantar*, 800 F.3d at 1052 (internal quotations and citations omitted). What matters is the "capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (internal quotations omitted) (emphasis in original). This does not require total uniformity across a class. "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). The commonality standard imposed by Rule 23(a)(2) is, however, "rigorous." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 512 (9th Cir. 2013).

Rule 23(b)(3) sets out the related but nonetheless distinct requirement that the common questions of law or fact predominate over the individual ones. This inquiry focuses on whether the "common questions present a significant aspect of the case and [if] they can be resolved for all members of the class in a single adjudication." *Hanlon*, 150 F.3d at 1022 (internal quotations and citation omitted); *see also Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 422, 453 (2016). Each element of a claim need not be susceptible to classwide proof, *Amgen*, 568 U.S. at 468-69, and the "important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016). Rule 23(b)(3) permits certification when "one or more of the central issues in the action are common to the class and can be said to predominate, . . . even though other important matters will

United States District Court
Northern District of California

have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members."  *Tyson*, 577 U.S. at 453 (internal quotations omitted).

"Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)," *Comcast*, 569 U.S. at 34, and the main concern under subsection (b)(3) is "the balance between individual and common issues."  *In re Hyundai and Kia Fuel Economy Litigation*, 926 F.3d 539, 560 (9th Cir. 2019) (en banc) (internal quotations omitted).  The Court finds it appropriate to assess commonality and predominance in tandem, with a careful eye toward ensuring that the specific requirements of each are fully satisfied.  *See*, *e.g.*, *Just Film*, 847 F.3d at 1120-21.

### 1.    Count I: Grace Period Claim

For this claim, plaintiffs seek certification on behalf of all Frontline Employees who "were unpaid for all time from punch-in to punch-out as a result of SkyWest's uniform policy of paying wages according to employees' scheduled hours."  Dkt. No. 134, Notice of Motion at 2.  The basis of this claim is a written policy contained in the CSPM,[1] which states:

> 5.  Pay to Schedule
>
>   A.  Employees are paid according to their scheduled shift.
>
>     1)  Employees are allowed to clock-in up to five minutes early but are only paid from the start of their scheduled shift.
>
>     2)  Employees are allowed to clock-out up to five minutes before or after the scheduled end of their shift without their pay being adjusted.
>
>       a)  Employees must have completed all work and have supervisor permission to leave work early.
>
>   B.  Any time worked beyond the five-minute leeway period will be paid only with supervisor approval.

Dkt. No. 134 at 9.

Plaintiffs challenge the first part of that policy.  They take issue with the fact that "[a]lthough SkyWest's payroll system permits employees to punch-in up to five minutes early," it "will only pay to Frontline Employees' scheduled hours -- not their actual punch records."  *Id.* at 10.  While this "grace period policy appears facially neutral," it is "far from neutral" in its

---

[1] The Court previously found that the CSPM, or Customer Service Policy Manual, is a collective bargaining agreement under the Railway Labor Act, 45 U.S.C. § 151 et seq.  *See* Dkt. No. 90.

application, plaintiffs say, with "early unpaid punch times" vastly outnumbering the "late paid punch times." *Id*. Plaintiffs' contention is that Frontline Employees "have begun working at the point of clocking-in," so they should get paid from punch-in and not from their scheduled start time. Dkt. No. 142 at 7.

Plaintiffs have not established commonality for this claim. To start, their proposed approach is a poor analytical fit with the claim. Plaintiffs say that "certain punch time rounding practices, sometimes called 'grace periods' -- like that utilized by SkyWest -- may be implemented so long as the rounding policy is facially neutral (*i.e.*, it permits both upward and downward rounding), and it is neutral in application (*i.e.*, the practice over time is 'a wash,' statistically not benefitting or burdening either employer or employees)." Dkt. No. 134 at 23 (citing *Corbin v. Time Warner Entm't-Advance/Newhouse P'ship*, 821 F.3d 1069, 1077-83 (9th Cir. 2016), and *See's Candy Shops, Inc. v. Superior Court*, 210 Cal. App. 4th 889, 910-13 (2012)). They also say that these are inquiries that can be made in common and which also satisfy the predominance requirement, because plaintiffs' grace period claims "will prevail or fail in unison." *Id*.

The problem for plaintiffs is that they conflate rounding policies and grace period policies, which are two different things entirely. *See's Candy* illustrates the need for careful attention to the differences between the two matters. It distinguished "the nearest-tenth rounding policy" and "the separate grace period policy." *See's Candy*, 210 Cal. App. 4th at 892. For the rounding policy, the court determined that the appropriate test was whether "the employer applies a consistent rounding policy that, on average, favors neither overpayment nor underpayment." *Id*. at 901-02 (internal quotations and citations omitted). In *Corbin*, our circuit expanded on this to hold that rounding policies are permissible if they are "facially neutral," *i.e.*, "rounds all employee time punches . . . without an eye towards whether the employer or the employee is benefitting from the rounding," and is "neutral in application," *i.e.*, "[s]ometimes [the employee] gained minutes and compensation, and sometimes [he] lost minutes and compensation." *Corbin*, 821 F.3d at 1079-80.

Rounding policies are applied to compensable time worked by employees. SkyWest's policy is better seen as a voluntary grace period during which the employee is, by default, not working. Frontline Employees were expressly advised by the policy that they were "allowed to

clock-in up to five minutes early" but they would only be "paid from the start of their scheduled shift." Dkt. No. 134 at 9. For grace period policies like these, "[t]o the extent an employee claims that he or she was not properly paid . . . , this claim raises factual questions involving whether the employee was in fact working and/or whether the employee was under the employer's control during the grace period." *See's Candy*, 210 Cal. App. 4th at 909. Plaintiffs cannot satisfy commonality by proposing to apply to SkyWest's grace period policy a rounding policy analysis.

While that is enough to deny certification of a grace period class, the record also shows that the correct inquiry -- whether the Frontline Employees were "in fact working" and/or were "under [SkyWest's] control during the grace period," *See's Candy*, 210 Cal. App. 4th at 909 -- is one that is not capable of classwide resolution "in one stroke." *Wal-Mart*, 564 U.S. at 350. By the Court's count, only 25 of the 42 class member declarations submitted by plaintiffs even mentioned this issue, and even when they did, the employees almost always used this stock formulation with no further factual detail: "As soon as I 'punched in,' I was expected to be ready to work immediately." *See* Dkt. Nos. 137, 138, 139, 140.[2] Such boilerplate language, repeated in a little over half of the declarations submitted by plaintiffs, does not establish commonality.

To be sure, named class member Cody Meek gave a little more factual detail, stating: "As soon as I 'punched in,' I was expected to be immediately ready to work. In the break room before I could punch in, I checked my shift assignment and would look at the computer monitor to see the status of planes coming and going from my gate. We could only punch in 5 minutes early but once I swiped in and grabbed my radio, I would immediately go to my assignment." Dkt. No. 137 ¶ 6. But these statements evince individual actions by Meek, and indicate that the Court would need to make individual inquiries of each class member to determine if other class members also chose to start working during the grace period, or if there was some other reason they felt they were under SkyWest's control during that time. SkyWest has submitted declarations from other putative class members that show that others took a different approach than Meek, and chose not to work during the grace period. *See*, *e.g.*, Dkt. No. 141-2, Ex. 10 ¶ 8 ("At SMX and SBP, there

---

[2] SkyWest's objections to the class member declarations are overruled, as are plaintiffs' objections to SkyWest's evidence. Dkt. No. 141 at 9-10; Dkt. No. 142 at 14.

were Agents who left their car at the curb in front of the terminal and went in to the breakroom to clock in before parking their car."); *id.*, Ex. 12 ¶ 15 ("I often see Agents in the breakroom hanging out, getting coffee and socializing after they have punched in but before the shift briefing begins.").  Commonality is lacking where, as here, "there is nothing to unite all of the plaintiffs' claims."  *Wal-Mart*, 564 U.S. at 360 n.10.

### 2.     Count II: Meal Period and Rest Break Claims

Plaintiffs allege that Frontline Employees missed meal periods and rest breaks without compensation as required by law.  Defendants contest commonality and predominance for these claims.

#### a.     Meal Periods

Plaintiffs have demonstrated commonality and predominance for the meal period claim. The starting point is California law, which provides that "an employer's obligation is to relieve its employee of all duty, with the employee thereafter at liberty to use the meal period for whatever purpose he or she desires"; "[e]mployers must afford employees uninterrupted half-hour periods in which they are relieved of any duty or employer control and are free to come and go as they please."  *Brinker Restaurant Corp. v. Superior Court*, 53 Cal. 4th 1004, 1017, 1037 (2012). California Labor Code Section 512(a) provides that "[a]n employer shall not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes, except that if the total work period per day of the employee is no more than six hours, the meal period may be waived by mutual consent of both the employer and employee."  Further, "[a]n employer shall not employ an employee for a work period of more than 10 hours per day without providing the employee with a second meal period of not less than 30 minutes, except that if the total hours worked is no more than 12 hours, the second meal period may be waived by mutual consent of the employer and the employee only if the first meal period was not waived."  Cal. Labor Code § 512(a).

In *Donohue v. AMN Services, LLC*, 11 Cal. 5th 58 (2021), the California Supreme Court noted that "even relatively minor infringements on meal periods can cause substantial burdens to the employee"; it further held that time records showing noncompliant meal periods raise a

United States District Court
Northern District of California

rebuttable presumption of meal period violations. *Donohue*, 11 Cal. 5th at 69, 74. "If an employer's records show no meal period for a given shift over five hours, a rebuttable presumption arises that the employee was not relieved of duty and no meal period was provided." *Id*. at 74. To the extent the employer asserts that "the employee waived the opportunity to have a work-free break," the "burden is on the employer, as the party asserting waiver, to plead and prove it." *Id*. (cleaned up).

Here, plaintiffs have submitted class members' time records, as well as their expert David Breshears' analysis of those records. Dkt. No. 135 ¶ 8 ("I have been provided with an Excel CSV file named 'PaySummary,' which covers the period from February 27, 2013 through October 18, 2020. This pay summary data contains, among others, the following information: (a) employee number, (b) location, (c) pay period, (d) work date, (e) pay code, (f) pay category (i.e., HOL, OT0.5, OT1, OT2, Reg, and Unpaid), (g) hours, and (h) time segment (e.g., 6:00 a.m. - 9:00 a.m.)."); *id*., Ex. C. Based on his analysis of these records, Breshears concluded that "[o]f the 378,332 employee work dates with hours worked in excess of five, . . . 151,531 employee work dates (or 40.1%) had a potential first meal break violation," and "[o]f the 67,579 employee work dates with hours worked in excess of ten, . . . 53,140 employee work dates over 10 hours (or 78.6%) had a potential second meal break violation." Dkt. No. 135 ¶¶ 22-23.

In addition, plaintiffs filed 43 class member declarations stating across the board that regular, uninterrupted meal breaks were not provided. *See*, *e.g.*, Dkt. No. 140-4 ¶ 9 ("During the course of our shifts, my co-workers and I were often unable to take regular, uninterrupted meal breaks. Sometimes meal breaks were interrupted to return to duty and other times they would get delayed towards the end of our shift."); Dkt. No. 140-7 ¶ 7 ("They would stop me in the middle of lunch to man a gate."); Dkt. No. 140-9 ¶ 8 ("There were no scheduled break times. Whenever there was a gap in your assigned gate, that's when you take your lunch."); Dkt. No. 140-14 ¶ 7 ("I would take a late meal break or miss a meal break approximately two times a week."); Dkt. No. 140-22 ¶ 7 ("I and my coworkers were sometime[s] not able to take lunch because there were too many flights and we were understaffed."); Dkt. No. 140-32 ¶ 7 ("It was actually pretty normal for me to have to work a shift without a full meal break."); Dkt. No. 140-33 ¶ 11 ("Often times I

United States District Court
Northern District of California

1  would get into the 6th or 7th hour of my shift before being able to eat a meal."); Dkt. No. 140-35

2  ¶ 12 ("During our meal breaks, there were times the supervisors would sit by you and interfere by

3  asking you to return to your shift.  Many times we would have to work through the promised 30

4  minutes meal break"); Dkt. No. 140-36 ¶ 8 ("During the course of our shifts, my co-workers and I

5  were often unable to take regular, uninterrupted meal breaks, depending on weather and how busy

6  the airport was."); Dkt. No. 140-37 ¶ 7 ("Missing meal and rest breaks was a normal part of our

7  day, as we were expected to prioritize the servicing of arriving and departing planes.").

8      This record establishes a rebuttable presumption of meal break violations under *Donohue*.

9  SkyWest did not rebut that presumption; if anything, its submissions are remarkably consistent

10  with plaintiffs' evidence of violations.  The declarations filed by SkyWest describe a workplace

11  that prioritized SkyWest's operational needs above all other concerns, and which was ruled by

12  frequent, unpredictable events ranging from extreme weather and mechanical malfunctions to

13  "[a]nimals on the runway."  Dkt. No. 141 at 5.  These occurrences may have caused unexpected

14  periods of downtime for employees on some days, but that did not relieve SkyWest of its legal

15  obligation to provide regular and timely meal periods every single work day.  The record indicates

16  that furnishing timely meal periods at the required intervals was simply not a priority for SkyWest.

17  *See*, *e.g.*, Dkt. No. 141-2, Ex. 1 ¶ 13 ("[B]ecause the job is fluid and there tends to be a lot of

18  downtime to rest and eat, Agents do not always want to take a 'formal' off-the-clock meal period

19  because they are not working that many hours and they would be rather be earning money.  There

20  has always been plenty of time to take breaks and often meal breaks are taken but you cannot

21  really tell from the time records because we were relaxed about making the Agents punch out and

22  we did not really enforce it."); Ex. 2 ¶ 16 ("How often this occurred was different for every

23  person, but every single Agent had good days with almost nothing to do for all of their shift and

24  other days where they could barely take any breaks unless they asked a supervisor to relieve them.

25  I was not always able to give someone a break in the moment of time they were asking"); Ex. 3

26  ¶ 16 ("Generally speaking, all agents' job responsibilities revolve around passenger needs and

27  flight schedules."); Ex. 8 ¶ 32 ("There were lulls between banks of flights, which is when Agents

28  took their meals and rest breaks and, on some days, enjoyed additional downtime.  Ramp Agents

had a lot more downtime and it was very rare for a Ramp Agent to take a meal late. . . . If, however, CS Agents did not take their meal period early enough (in the 4th hour), they might have to take it late or take 30 minutes instead of an hour because they were customer-facing and were obligated to handle passenger issues as quickly as possible to ensure that the passengers could make it to their destinations").

It may be, as SkyWest suggests, that "sometimes there was so much downtime in between flights that agents were able to relax in the breakroom, get food, watch TV, or play games for at least 30, uninterrupted minutes -- all on the clock." Dkt. No. 141 at 13-14. That is still no grounds for SkyWest's failure to provide "uninterrupted half-hour periods in which [employees] are relieved of any duty or employer control and are free to come and go as they please," *Brinker*, 53 Cal. 4th at 1037, at the intervals mandated by law, every single day. What matters for present purposes is that SkyWest does not dispute that it has a "practice of not paying meal- or rest-period premiums," Dkt. No. 141 at 16 n.14, as is required for missed, late, or condensed meal periods.

Consequently, plaintiffs have established commonality in that the class members "have suffered the same injury." *Wal-Mart*, 564 U.S. at 350 (quotations omitted). They were deprived of meal periods and were not paid the premiums to which they were legally entitled. The record supports the finding that there was here a "common pattern and practice that could affect the class *as a whole*." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 (9th Cir. 2011) (emphasis in original).

Predominance is also satisfied. "[N]early all of the evidence in the record," including SkyWest's employee declarations about its "actual business practices," support a finding that common issues of law and fact would predominate over any individual issues. *Abdullah v. U.S. Security Associates, Inc.*, 731 F.3d 952, 965 (9th Cir. 2013).

### b. Rest Breaks

The same evidentiary record supports certification of a rest breaks class. Unlike the meal periods claim, there is no time record data to support missed, late, or condensed rest breaks because the Frontline Employees were not required to clock in and out for rest breaks. *See* Dkt. No. 140-35 ¶ 9 ("I used my identification card to 'punch in' and 'punch out' each day that I

United States District Court
Northern District of California

worked, however, it was not used to clock out for breaks.  There was no way to punch in or punch out for breaks, since the ID badges were only used at the beginning and end of our shifts."); Dkt. No. 141-2, Ex. 6, ¶ 10 ("SkyWest . . . does not require employees to record their rest breaks, so there is no record of rest breaks that are taken, skipped, delayed, or short.").

Even so, the declarations filed by both sides show a pattern and practice of rest break violations across the proposed class.  On the plaintiffs' side, for example, the declarants stated, (1) "We also did not always get our 10-minute rest breaks or they could be shortened or delayed, especially on a bad day where flights were delayed for rain or fog," Dkt. No. 140-7 ¶ 7; (2) "Whatever space there was between flights was considered your break, but since we [were] short staffed, we would have to help other gates service aircraft, so we didn't get any break time," Dkt. No. 140-18 ¶ 8; (3) "I complained about the issues regarding delayed, interrupted, or missed rest breaks with my supervisors.  In response to my concerns I was told it was part of the job and that we were expected to take breaks in between flights.  I was hardly ever able to take a rest break," Dkt. No. 140-23 ¶ 12; (4) "I don't recall getting our 10-minute rest breaks or they could be shortened or delayed.  I just remember them being busy and needing bodies out there," Dkt. No. 140-34 ¶ 8.  And once again, the declarations on SkyWest's side are consistent on the point that rest breaks were not regularly provided and were subject to operational needs, for example, (1) "In an average day there was so much downtime that we did not keep track of or police when Agents were taking their rest breaks or keep track of how long they were.  We left that to the Agents and told them to let us know if ever they were not able to get one," Dkt. No. 141-2, Ex. 2 ¶ 14; (2) "There was often sufficient downtime that there was no need for Supervisors to track, monitor, or schedule rest breaks," *id*., Ex. 4 ¶ 18; (3) "We did not monitor employees about taking rest breaks and rest breaks were not scheduled for the employees," *id*., Ex. 8 ¶ 10.

For rest breaks too, SkyWest has conceded that it did not pay any rest-period premiums to those Frontline Employees who had any missed, late, or shortened rest breaks.  Dkt. No. 141 at 16 n.14.

Consequently, plaintiffs have established commonality for the rest break claims in that the class members "have suffered the same injury."  *Wal-Mart*, 564 U.S. at 350 (quotations omitted).

1    The record supports the finding that there was here a "common pattern and practice that could

2    affect the class *as a whole*," in that class members were deprived of rest breaks and were not paid

3    the premiums to which they were legally entitled. *Ellis*, 657 F.3d at 983 (emphasis in original).

4        Predominance is also satisfied. The evidence before the Court, including SkyWest's

5    employee declarations about its "actual business practices," support a finding that common

6    questions would predominate over individual ones. *Abdullah*, 731 F.3d at 965. SkyWest's final

7    contention that geographic diversity defeats commonality and predominance is rejected. Not only

8    do the submitted declarations and SkyWest's opposition brief paint a picture of a company culture

9    that was consistent across the company, Breshears' analysis was based on pay data from 15

10   different California airports. *See* Dkt. No. 135 at 2 n.1 ("For purposes of this report, my analysis

11   is based on the following locations: ACV, BUR, CEC, CIC, CLD, IPL, IYK, LAX, LGB, MOD,

12   ONT, RDD, SBP, SCK, and SFO.").

13                           **3.      Counts V & VI: Derivative Claims**

14       Plaintiffs seek certification of a "derivative claims" class "arising from: (1) the failure to

15   pay all wages due and owing at the time of termination that entitled Frontline Employees to

16   waiting time penalties consisting of up to 30 days of wages under Cal. Lab. Code §§ 201, 202, and

17   203; and (2) certification of a claim under California's Unfair Competition Law ('UCL'), Bus. &

18   Prof. Code §§ 17200 et seq., which entitles aggrieved employees to obtain a four-year look back

19   on the statute of limitations applicable to their claims." Dkt. No. 134, Notice of Motion at 2-3.

20       Because these claims are derivative, the parties treated the question of certification as

21   derivative. *See* Dkt. No. 134 at 15 ("Because these claims are wholly derivative, Plaintiffs devote

22   no further separate discussion to them."); Dkt. No. 141 at 25 ("Because Plaintiffs have failed to

23   prove that class certification is appropriate for their pay-to-the-schedule (Count 1) and meal- and

24   rest-period (Count 2) claims, this Court should deny certification of Plaintiffs' derivative claims

25   (Counts 5 and 6) to the extent they rely on 1 and 2.").

26       The Court finds that the derivative claims may be certified without further analysis to the

27   extent they rely on the certified meal period and rest breaks claim.

28

United States District Court
Northern District of California

13

### D. Superiority (23(b)(3))

The final certification question is whether the ends of justice and efficiency are served by certification. Rule 23(b)(3) requires a finding that proceeding as a class is superior to other ways of adjudicating the controversy. Plaintiffs say that in employment cases like these, "the alternative to a class case is often no case at all," and "the individual damages are often too small to merit individual actions." Dkt. No. 134 at 24-25. SkyWest has not challenged superiority, Dkt. No. 141, and the Court finds this factor satisfied.

## II. ADMINISTRATIVE MOTION TO SEAL

Plaintiffs filed a motion to provisionally seal portions of their certification motion and an attachment to the Breshears declaration, because SkyWest had designated certain underlying documents as "Confidential" under the protective order in this case. Dkt. No. 132.

SkyWest has not come forward with a designating party's responsive declaration as required under Civil Local Rule 79-5(e) to maintain the sealing. Consequently, sealing is denied. Plaintiffs are directed to file unredacted copies of the documents on the ECF docket by no earlier than 4 days, and no later than 10 days, from the date of this order. Civil L.R. 79-5(e)(2).

## CONCLUSION

The Court certifies the following classes:

1) All individuals currently or formerly employed by SkyWest Airlines, Inc. and SkyWest, Inc. as Frontline Employees who worked on the ground and were paid on an hourly basis for at least one shift in the State of California at any time from February 27, 2013, through October 18, 2020, who:

   a. (1) worked for more than five hours during at least one shift and did not receive a meal period that began before the end of the fifth hour of work, and/or worked for more than ten hours on a shift and did not receive a second meal period that began before the end of the tenth hour of work; (2) had a meal period shortened less than the 30 minutes required; and/or (3) had an untimely meal period delayed after the fifth hour or tenth hour of work; and

United States District Court
Northern District of California

        b.  did not receive from SkyWest missed meal break premium wages as required
            by Cal. Wage Order 9-2001 § 11(A)-(B), and Cal. Lab. Code §§ 226.7(c) and
            512.

2)  All individuals currently or formerly employed by SkyWest Airlines, Inc. and
    SkyWest, Inc. as Frontline Employees who worked on the ground and were paid on an
    hourly basis for at least one shift in the State of California at any time from February
    27, 2013, through October 18, 2020, who:

        a.  (1) did not receive at least ten minutes of rest time for each four hours of work
            in violation of Cal. Wage Order 9-2001 § 12(A); (2) had a rest period shortened
            from the ten minutes required; and/or (3) had an untimely rest period that was
            delayed so that the rest period was not taken near the middle of each four-hour
            block of the employee's shift; and

        b.  did not receive from SkyWest one hour of compensation for each workday that
            the rest period was not provided as required by Cal. Wage Order 9-2001
            § 12(B), and Cal. Lab. Code §§ 226.7(c).

3)  All individuals formerly employed by SkyWest Airlines, Inc. and SkyWest, Inc. as
    Frontline Employees who worked on the ground and were paid on an hourly basis for
    at least one shift in the State of California at any time from February 27, 2013, through
    October 18, 2020, who were subject to a meal or rest break violation for which they did
    not receive statutory premium wages and who consequently did not receive all wages
    due and owing at the time of termination.

4)  All individuals currently or formerly employed by SkyWest Airlines, Inc. and
    SkyWest, Inc. as Frontline Employees who worked on the ground and were paid on an
    hourly basis for at least one shift in the State of California at any time from February
    27, 2013, through October 18, 2020, who were subject to a meal or rest break violation
    for which they did not receive statutory premium wages and who on that basis assert a
    violation of the Unfair Competition Law, Bus. & Prof. Code §§ 17200 et seq.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs Cody Meek, Jeremy Barnes, and Coryell Ross are appointed class representatives, and their counsel at Greg Coleman Law PC, Simmons Hanly Conroy LLC, and Kaplan Fox & Kilsheimer LLP are appointed class counsel.

Plaintiffs are ordered to submit by October 29, 2021, a proposed plan for dissemination of notice to the classes.  Plaintiffs will meet and confer with SkyWest at least 10 days in advance of submitting the plan so that the proposal can be submitted on a joint basis to the fullest extent possible.

The parties are directed again to contact Magistrate Judge Hixson for a further settlement conference.

**IT IS SO ORDERED.**

Dated:  September 29, 2021

_____
JAMES DONATO
United States District Judge